And we'll turn to the second case on our calendar today, USA v. Gregory Herman. Mr. Johnson, go ahead. May it please the Court, my name is Barclay Johnson, I'm an attorney with the Federal Defender's Office in Vermont and I'm pleased to be here on behalf of Mr. Herman. In Rodriguez v. United States, the Supreme Court held that even a de minimis extension of a traffic stop that is not supported by reasonable suspicion will violate the Fourth Amendment. And the District Court here concluded, and there's no dispute, that Trooper Slusser did in fact extend the stop after the warning was issued when he continued the stop to conduct a dog sniff of the car. And we agree or argue that there wasn't reasonable suspicion to support this. We also argue, though, that the stop was extended even before this when, as he was searching Mr. Putney, Trooper Slusser began to ask a series of questions about Mr. Putney's comings and goings, and then sagged into more questions about his relationship with Mr. Herman's comings and goings and Mr. Herman's family. And we argue that this is the point where the stop is initially extended, where Trooper Slusser moves into a drug investigation mode, and this is the point at which reasonable suspicion must be judged. Looking to the factors that the District Court identified, Mr. Herman argues that these are irrelevant, wrong, misinterpreted, and fail to account for the fact that on the one hand, the authorities determined Mr. Herman was not their suspect, and that on the other hand, they had no information about Mr. . . . At what point did they determine that he was not their suspect? Before he even met Mr. Putney. So the testimony at the hearing was that he got off the bus. By the time he had walked to the gas station, the adjoining gas station, gone in, and then gotten into Mr. Putney's car, that they knew he was not their suspect. And the corollary to that is that at that point they knew that this information they had, that they were waiting for a suspected drug courier, that information pertained to a different part of the state entirely. And . . . At what point would you concede that they had some reasonable suspicion as to Mr. Putney? We don't think they had reasonable suspicion. At any point? No. Reasonable suspicion looks to, you know, particularized information that there's illegal activity ongoing at that point. We don't think that the general suspicion that they had about Mr. Putney and his drug dealing creates some sort of a blanket authorization to stop them. We think a holding along those lines would be to say, you know, once you have that information, you can stop Mr. Putney any time, any place, whether he's on his way to church, whether he's at church, whether he's at the beach with his family. Well, do you dispute that they had at least a basis to stop the car based on a traffic infraction? Yes. He was . . . the testimony is clear that he was speeding. Okay. So, there was some period of time during which they could ask him questions and during which Trooper Slusser, if I'm pronouncing that correctly, could ask him questions in connection with giving him a warning, a traffic warning, right? Yes, but we think and argue, you know, the kind of questions you can ask have to be limited to the traffic stop, the, you know, highway safety concerns, the, you know, registration concerns and not drug dealing. Are you relying on Rodriguez for that proposition? Yes. The district court, when it approved or thought it was okay to ask questions about comings and goings like at Harrison, we think that case doesn't survive Rodriguez. In Harrison, you know, the court approved those sorts of questions because they extended the traffic stop only a little bit. Rodriguez, of course, says that even a de minimis extension of the stop is not okay. Well, did you argue that Mr. Trooper Slusser delayed the issuance of the warning? Yes. You argued that to the district court? I think it's implicit and we certainly argue it now. I think it's included in the idea that the traffic stop was extended. Well, but extended beyond the period of the, after the warning, I thought it was part of your argument. That is, that's, we would argue that as well. We think there wasn't reasonable suspicion. So your argument is that the first six minutes during which he is at, during which the trooper is asking questions of Mr. Putney, that that was more than what was required? Yes. Okay. Turning to some of the other factors, you know, the court below cited the arrival of the bus from a source city. We think that this court's precedent doesn't support this as a factor. The cases Glover and Hamilton suggest there needs to be more to make this a meaningful factory. Those cases involve the, what the court has called the dubious express bus to Buffalo and involves, you know, behavior on the part of the suspect that set them apart from the other passengers. We don't have anything like that here. What was it that informed the authorities that your client was not the person that the informant had predicted would arrive with drugs? I think the testimony was that, from the detective, was when they ran the plates on Mr. Putney's truck, they realized who Mr. Putney was and they realized that Mr. Herman must not be the person they were looking for. But in terms of the source city, you know, the figures cited by the government below, some 14,000 bags of heroin, you know, covered all forms of public transportation into Vermont for almost a year. And we think that suggests nothing more than a trickle of drugs into Vermont on public transportation and nothing more than that the vast, vast majority of people arriving in Vermont on public transportation are doing so entirely lawfully. I think there are two other reasons to be skeptical, both because our system is organized around hubs and spokes, and so every arrival is going to be at some point or another from a source city, and that's doubly true for Vermont, and I'll reserve my three minutes for rebuttal. Thank you, sir. Ms. Nolan? Thank you, Your Honor. It's our view that before the traffic stop even began, before the blue lights went on, Trooper Slusser had reasonable suspicion to conduct that traffic stop as a Terry stop to investigate drugs. And the reason is he had at least two credible sources, one his sergeant, his traffic supervising officer, who told him that Francis and Robert Putney were involved in heroin trafficking, and he'd also heard from Sergeant Gardner, who was an experienced drug investigator, that the Putney brothers were involved in heroin trafficking out of that garage in Graniteville, Vermont. In addition, he knew, again, before he initiated the traffic stop, that a vehicle registered to Robert Putney and recently operated by Francis Putney was picking up a passenger who was arriving from a source city via a method of transportation used by drug couriers at a point of entry for drug couriers to Vermont. So we would, as an initial matter, take the position that even before the stop began, there was reasonable suspicion to justify— So as to the third plank of that, Mr. Johnson insists that the officers ultimately concluded that Mr. Herman was not that passenger. So it is true, it is definitely true, that they were there initially looking for a different drug courier. They were looking for a drug courier who they had got a tip from a St. Johnsbury informant, so a different part of the state. They had a tip, an unrelated tip. But when they saw Mr. Herman interacting with the known drug trafficker, Francis Putney, and getting into that car, they developed a new suspicion that he was a different drug courier. And we believe—and again, there was substantial intelligence to support the suspicion of Mr. Putney. Sergeant Gardner detailed a variety of sources he had to believe that Francis Putney was engaged in heroin trafficking. And when they saw him pick up Gregory Herman, they developed a new suspicion that Mr. Herman was a different drug courier. Certainly, even if the court doubts that there was a reasonable suspicion before the traffic stop to conduct it as a Terry stop to confirm or dispel suspicion of drug trafficking, as the stop unfolded, we would submit that Trooper Schlesser developed more facts that gave rise to suspicion. And I think the high points—at least suspicion to justify briefly prolonging the stop. And again, this was a—if you do view it as a prolonging of the stop, which we're urging you not to, but if you do, it's only a three-minute delay between the issuance of the warning and the deployment of the drug dog and the positive hit on the vehicle. But there were suspicious circumstances that arose during the traffic stop, including 30 seconds to come to a stop, inability to produce— On a highway. Certainly, that's Mr. Herman's view as well. I guess Trooper Schlesser's testimony that it was, compared to his thousands of other stops, it was a long time to him, compared to the other stops he's conducted. Clearly, Your Honor doesn't think that that's a terrible— You think that 30 seconds is a long time to stop on a highway? I hate to— You don't even know that the police officer behind you is necessarily going after you? I guess it struck me as a long time, Your Honor, but perhaps my view doesn't matter. I suppose Judge Rice's view does matter. I think the Chief Judge assigned some significance to the fact. At a minimum, we'd urge you to find that it wasn't clear error for her to assign some significance to the fact. I think the excessive nervousness—I think everybody is a bit nervous during a traffic stop, but I think Trooper Schlesser's testimony was that the nervousness was quite uncommon for somebody who had just been stopped for speeding. Again, I think Judge Rice assigned some significance to that fact. Given that it's uncontroverted testimony, we'd urge you to, at a minimum, find it wasn't clear error. I think more significantly, his statements about where he'd come from and where he was going were enough to raise a reasonable officer's suspicions. He made a point of not mentioning the bus stop when he was asked where he was coming from. When he was asked, I think most importantly, where he was taking Mr. Herman, he said, somewhere in Barrie, but he didn't know where. He said Mr. Herman was going to walk from there to another location, but he didn't know where, to visit with family members whose identity he didn't know, all of whom couldn't drive apparently. What did that have to do with issuing a traffic warning? Your adversary says that those questions were, in a sense, part of the analysis in determining whether there was an unconstitutional delay. I think, as an initial matter, they were all, I don't think that this case is just a traffic stop speeding case. I think they had reasonable suspicion to conduct a drug investigation, but if we do view it as initially only justified as a speeding stop, I think his initial, the initial suspicious signs at the outset of the traffic stop justified expanding the scope and duration of the questioning to some degree to assess those initial signs of suspicion. Is it your position that it was permissible to stop him even if he wasn't speeding? That is my position, Your Honor. I think that there was... The authorities could have stopped him at any time. I think that's correct as a... Wherever he was. I think that's correct after he pulled out of the bus stop, given all the intel they had, intelligence they had about his involvement in narcotics trafficking, and given the circumstances of Mr. Herman's arrival. Certainly if the... What's the significance of his arrival? Does it mean they have reasonable suspicion to stop this car any time it picks up somebody? I think the suspicion, perhaps when it picks somebody up at a point of entry for drug couriers to Vermont, the suspicion initially was with Mr.... Bus station. Yes, a bus station. The suspicion initially certainly attached, the reason that they even focused on Mr. Herman at all is because of Mr. Putney, and the wealth of information they had about him trafficking narcotics out of the family garage in the Graniteville area. If he hadn't... If Mr. Putney had not been present in the parking lot, there would have been no suspicion, I agree, to attach to Mr. Herman. But it's because he involved himself with a known drug dealer that the suspicion and Mr. Putney and his vehicle, of which Mr. Herman made himself a passenger. But we also think that as the stop unfolded, the suspicion burgeoned basically at every moment justifying... Is there any place Mr. Putney could go that he couldn't be stopped? Place that he could... On your theory of reasonable suspicion. If the court accepts my initial argument, he could have been stopped anywhere. But we of course... Without our accepting it, that is your... I believe there was. I believe there was given the... It's of course substantially lower standard than probable cause, the reasonable suspicion standard. And we do submit that there was enough evidence to reach that reasonable suspicion quantum given Francis Putney's involvement, his being one of the motorists. The speeding violations, of course, provided another basis to allow for the traffic stop. I think that that... And I do want to point out too, to the extent that the court views this as an extension of what began, what was only justified at the beginning as a speeding stop. Was it only justified? I asked you whether your theory is he could have been stopped anywhere because you had reasonable suspicion he was involved in drug trafficking. Francis Putney was, correct. So you're not... So you were not... Your theory is he could have been stopped even if he was not speeding. I thought that was... Correct. Correct. But in the alternative, if the court does not accept that argument, I think an extension of the speeding stop, the stop for speeding, so an extension to investigate potential drug trafficking was justified by the nervousness and sort of the nervousness Mr. Putney showed and also by what we view as vague and sort of nonsensical statements he made about where he was going and his inability to provide an explanation while being able to talk with specificity about subjects that seemed to feel safe to him, such as the Alaska K-9 unit and the towing work he did for the state police. So I think that the circumstances that the trooper observed as the stop unfolded, certainly if one is only viewing this as justified as a speeding stop, gave him a basis to expand the scope and duration for a brief time to deploy the K-9, unlike in Rodriguez. There was a reference earlier by your opponent, your adversary, to the dubious bus trip to, in another case, to Buffalo. This is really an off-record inquiry. I mean, is there something about bus stops in Vermont that makes them special in the law enforcement culture of Vermont? I think it is an understanding within law enforcement that oftentimes in order to lessen your risk of detection, at least back in 2015, people who were transporting drugs to Vermont were coming at least to a measure that drew the state police's attention, coming via the bus lines. The testimony about the quantity of drugs seized from bus lines in 2015 was just for the state police. It didn't include federal agencies and other local agencies that might have been involved in seizing drugs from the bus lines. So yes, I think in the record, at the hearing, and in her findings, the district court findings, she attached some significance to the fact that Mr. Herman arrived on a bus line, which was a way that people had been bringing—we had seen patterns about people bringing drugs to Vermont via bus lines, including the Greyhound. Thank you. Thank you. All right. Thank you. Again, we think the facts of this case are very distinguishable from the Glover and other cases involving source cities, and the amount of drugs seized over the course of a year is— Source cities, like? Like New York City. So I think factually it's distinguishable in that there's a very small amount of drugs seized over the course of a year for not just buses, but all forms of public transportation in Vermont, and there's nothing that Mr. Herman does— You mean compared to—I'm sorry to interrupt you, but compared to other sources of heroin going into Vermont? Compared to Glover and Harrison, I think the buses there, you know, the police had specific information about a specific bus that they repeatedly found people on carrying drugs. That's just not the case here, and the amount of drugs over all forms of public transportation in Vermont indicate that that's distinguishable. And for Vermont, you know, it's just—the source city factor is really a throwaway factor because Vermont's one of the smallest cities or states in the country. Any form of public transportation arriving in Vermont is going to arrive from a larger city. As I understand it from Ms. Nolan, since Harrison in 2010 and by 2015, buses, these bus stations were being used as a—and there was actual intelligence available to the state troopers that these bus stations were being used as a major depot for trafficking. I don't think that that's—I don't think the record— Is that the testimony, or— No, I don't think the record supports that. You know, we're talking about 10,000—14,000 to 15,000 bags of heroin. Mr. Herman was arrested with 1,200. So we're talking about 10, maybe 11 arrests over the course of a year over all forms of public transportation in Vermont. That's a trickle. All it tells us is that the vast, vast majority of people are lawfully exercising their constitutional rights to travel. I think the logical extension, and the court has asked a couple questions about this, of the government's blanket reasonable suspicion argument for Mr. Putnam, he just isn't tenable. Reasonable suspicion, again, asks for some articulable, particularized information that there's illegal activity ongoing at that point. There has to be places, church, the beach with his kids, where someone can go without being pulled over. And we think, in this case, simply picking up an unknown person doesn't add that to the reasonable suspicion equation. Unless the court has any information, I'll conclude. Thank you. Thank you, Mr. Johnson and Ms. Nolan. We appreciate your arguments. And we'll reserve the decision until